STERLING CORK & SEAL CO. *v.* PH. KLING BREWING CO..

1. TRIAL—REQUESTED DIRECTED VERDICT BY BOTH PARTIES WITHOUT RESERVATION REMOVES ISSUES OF FACT FOR JURY FROM CASE.
Where both parties ask for a directed verdict without reservation or contingent requests, issues of fact for the jury are thereby removed from the case.[1]

2. SALES—CONTRACTS—CONSTRUCTION.
Where a contract for 25,000 gross of crowns for beer bottles at 18½ cents per gross, executed in April, further provided that if 100,000 gross were "used during the season," the price should be 18 cents per gross, the most that the buyer was entitled to thereunder were the crowns actually used by it during the remaining months of that year.[2]

3. SAME—EVIDENCE OF INTENT NOT COMMUNICATED TO OTHER PARTY NOT ADMISSIBLE.
The trial court properly excluded testimony of the buyer as to what he had determined would be a fair amount of reserve crowns to keep on hand, where said determination had not been communicated to the seller.[3]

4. SAME—CONTRACTS—CONSTRUCTION.
The buyer's contention that, the seller having delivered the 25,000 gross crowns specified in the order, it accepted the entire order as a continuing one good for the balance of the year unless withdrawn, and that it should be construed as a contract for whatever the buyer might order up to 100,000 gross at 18½ cents, and beyond that at 18 cents per gross, cannot be sustained, since such construction would eliminate the words "used during the season," by which the optional feature of the contract is qualified.[4]

Error to Wayne; Dingeman (Harry J.), J. Submitted June 13, 1924. (Docket No. 86.) Decided October 6, 1924.

---

[1]Trial, 38 Cyc. p. 1583; [2]Sales, 35 Cyc. p. 96; [3]Id., 35 Cyc. p. 570 (1926 Anno); [4]Id., 35 Cyc. p. 119.

Assumpsit by the Sterling Cork & Seal Company against the Ph. Kling Brewing Company for goods sold and delivered.    Judgment for plaintiff on a directed verdict.    Defendant brings error.    Affirmed.

*E. W. Mulford,* for appellant.

*Lucking, Helfman, Lucking & Hanlon,* for appellee.

STEERE, J.    The Sterling Cork & Seal Company is a corporation of Toledo, Ohio, engaged in the manufacture of "crowns" or caps for sealing bottles.    In 1917 and for years before the Ph. Kling Brewing Company was a corporation lawfully engaged in the brewing business at Detroit, Michigan, and required large quantities of crowns for its bottled goods, a portion of which it had purchased from plaintiff for several years.    This action was brought by plaintiff to recover an unpaid balance, amounting with interest to $1,778.55, for crowns it had sold and shipped to defendant during the year 1917.    Defendant admitted that the balance claimed due at the contract price for crowns it had received from plaintiff during that year was correct, but set up in its special notice under a plea of the general issue, and contended upon the trial, that it had sustained damages amounting to $1,620 in excess of the admitted balance through plaintiff's breach of their contract by refusing to furnish the quantity of crowns contracted for, which necessitated defendant buying them in the open market at a much higher price.    Both parties asked for a directed verdict without reservation or contingent requests, thereby removing from the case any question of issues of fact for the jury.    *City National Bank* v. *Price's Estate,* 225 Mich. 200.    The trial court held that under the terms of their contract defendant had failed to establish its counterclaim for damages and

directed a verdict for plaintiff for its admitted balance of $1,778.55, entering judgment therefor.

The contract out of which this litigation arose is evidenced by the following order of defendant and plaintiff's letter of acceptance:

"ORDER BLANK.

No. 989.

"PH. KLING BREWING COMPANY.

Detroit, Mich., U. S. A.

Date April 3, 1917.

"STERLING CORK & SEAL CO.,

"Toledo, Ohio.

"Kindly enter our order for—

"25,000 gross, Lacquered on both sides, embossed, composition, paraffined Crowns, quality as before.

"10,000 gross to be shipped between now and May 1st.

"15,000 gross in car May 10th.

"Price 18½c per gross, F. O. B. Toledo.

(If 100,000 or more are *used* during the season, price is to be 18c per gross.   This quantity to be billed at the same price or credit issued for the difference), and charge to account of

"PH. KLING BREWING CO.

"Per Kling.

"Positively no goods to be delivered except on presentation of order.   Please attach duplicate order to your invoice."

"April 7, 1917.

"PH. KLING BREWING CO.,

"Detroit, Mich.

"*Gentlemen:* In reference to our telephone conversation this morning with Mr. Kling, regarding your order No. 989 of April 3d for 25,000 gross lacquered on both sides, embossed, composition, paraffined crowns, 10,000 gross to be shipped on or before May 1st via the White Star Line and 15,000 gross on May 10th in one shipment via the D. U. R., price on above to be 18½c per gross, f. o. b. Toledo, with the privilege of increasing the above order during 1917 to 100,000 gross or more at 18c per gross on the whole amount, beg to confirm our acceptance of same.

"It is also understood that the numbers on the crowns are to be eliminated on this and future orders.

"We inclose herewith credit memorandum for $188.25 representing freight charges on crowns from January 20, 1916, to March 30, 1917, which we have placed to your credit; also statement of your account to date as requested in your letter of the 4th.

"Thanking you very kindly for this order, which we assure you will be given our careful attention, and also for all past orders, we beg to remain,

"Very truly yours,
"THE STERLING CORK & SEAL CO.
"W. H. MIMER,
"Secretary-Treasurer."

Subsequent events were fairly summarized by the court in directing a verdict as follows:

"Twenty-five thousand gross of these crowns were shipped to defendant some time during May, and no further correspondence was had between the parties until July 11, 1917, when defendant wrote plaintiff:

" 'Your Mr. Stalder was in our office some time ago and asked us to let you know when we would be in a position to give you shipping instructions for the balance of crowns on order No. 989 of April 3d.    Of this order there were 25,000 gross shipped, leaving a balance due of 75,000 gross.    We have carefully checked over our stock and you may prepare 20,000 gross of embossed and 5,000 gross of plain lacquered on both sides.    We are not in a very great hurry for this shipment and if it would come forward to us the early part of August this would be satisfactory.    We are unable at this time to give you shipping instructions for the balance.'  *  *  *

"On July 16, 1917, the plaintiff responded to this letter in part as follows:

" 'Our records conform with yours in that we still have a balance of 75,000 gross coming on the above order.'

"On August 15, 1917, the plaintiff wrote defendant in effect that they were sending via White Star Line 16 bbls. of crowns which they made up for the defendant for some time.

"No further correspondence was had between the

parties until December 10, 1917, when defendant wrote plaintiff as follows:

"'Referring to our order of April 3, 1917, our books indicate that we still have 56,000 gross of lacquered and embossed crowns still coming, and 4,000 gross of plain lacquered still coming. Will you kindly advise us when the next shipment will go forward.'

"Replying to this letter, plaintiff, on December 11, 1917, responded in part as follows:

"'Your order No. 989 of April 3d, calls for 25,000 gross lacquered on both sides, embossed, composition paraffine crowns at 18½c per gross f. o. b. Toledo, with the provision that if 100,000 or more are used during the season, the price is to be 18 cents per gross. * * * The evident intent of this order is that we are to furnish you with what crowns you use up to 100,000 gross per your shipping instructions. We will, therefore, not make shipments on this order beyond the quantity you will actually use during 1917, in addition to the shipment going forward this week. In doing this, we are complying with the terms of this order.'

"On December 20, 1917, the defendant wrote plaintiff:

"'We have your letter of Dec. 11, advising that you still have 4,000 gross of lacquered and 1,000 gross of lacquered and embossed crowns that you are preparing for us and that they will be shipped this week. Up to the present time we have no advice that they have been shipped. We are in urgent need of crowns at this time, and would require that if they have already been shipped that you may trace from your end. You may prepare 15,000 gross of lacquered and embossed crown(s) the same as before and 10,000 gross of lacquered crowns the same as before, and ship to us before the 1st of January, 1918. We are running very light on crowns now, and request that you give this order your special attention so that shipment will be made as requested.'

"No further correspondence was had during 1917, and after some communications had passed between the parties in the early part of 1918, defendant went into the open market and purchased crowns at an advanced price of 32 cents, and some at 39 cents, and defendant seeks to recover here the difference between the 18½ cents provided by the contract, and the market price in December, 1917; namely, 32 cents."

Kurt Kling, the general manager and treasurer of defendant before, during and after the year 1917, gave the order in question and had charge of the correspondence which followed.    He testified that as a matter of good business judgment they customarily kept a reserve of crowns, bottles and other supplies necessary for use in their line of production on hand, ahead of their actual needs from day to day, as well as a reserve of their product in kegs and bottles ready for sale; that for the winter months they usually kept about four months' supplies on hand, depending on the volume of business they had.    In that connection he also testified on cross-examination that on December 1, 1917, defendant had on hand 18,500 gross of crowns and on January 1, 1918, it had 21,100 gross, and said that "twenty-one thousand one hundred gross crowns would probably have carried us four (4) months."    He also testified that "December is usually a dull season in the beer business.    The height of the season is the summer months," and that they sold more beer in a hot summer than a cold one.    A witness named Schaefer who was a book-keeper in defendant's employ testified to January being a dull month.

Kling did not explain what he meant in his order of April 3, 1917, by "used during the season," nor what a season was in the beer business, except as he called December and the summer months a "season," but it concededly would not be construed as extending beyond the remaining nearly 9 months of that year. When unqualified by context or adjective it specifically indicates a much shorter period of a year, as divided into seasons by the annual motion of the sun in declination.

The trial court apparently construed the order of April 3d and acceptance of April 7th as a binding contract between the parties for sale and purchase of 25,000 gross crowns, with an optional provision en-

titling defendant to such additional quantity as it might need and use in its business during 1917, and "in the event that it used 100,000 (gross) crowns or more the price would be 18c per gross," concluding:

"The burden being upon the defendant and there being no proof in the case that at the time the order of December 20, 1917, was sent to plaintiff, that the crowns there referred to were for use during the season of 1917, but on the contrary it appearing that the defendant had on hand at that time more than would be used during the remainder of that season (admittedly a dull season in defendant's business), I feel that a verdict should be directed in this case in favor of the plaintiff for the amount of its claim, and that defendant's claimed set-off should be disallowed."

Against the court's construction defendant's counsel contends that a reserve supply of crowns customarily kept on hand was a factor which the court ignored, erroneously sustaining plaintiff's objection to the following question asked Kling:

"Did you determine long before this matter came up what would be a fair amount of reserve crowns to keep on hand in your business?"

The court was of the opinion that what Kling thought or determined he would do in that respect was not binding "unless it was communicated to plaintiff." We find no reversible error in this ruling. No mention is made of a reserve supply in the contract and if the policy of defendant in that particular was a factor to be considered in construing it Kling was allowed to state the facts. His testimony also showed that defendant had on hand a good reserve in November and December, 1917, and on January 1, 1918, a sufficient reserve ahead to carry it through the dull winter months which followed. However long before Kling may have determined on a reserve supply or its magnitude, he is not shown to have made it mani-

fest to plaintiff until December 10, 1917, after the market price of crowns had nearly doubled.

It is further contended for defendant that plaintiff having delivered the 25,000 gross of crowns specified in the order for delivery in May, it accepted the entire order as a continuing one good for the balance of the year unless withdrawn before its acceptance by defendant and the agreement considered in its entirety should be construed as a "contract for whatever it (defendant) might order up to 100,000 gross crowns at 18½ cents per gross, and beyond that at 18 cents per gross." Such a construction would in effect eliminate the words "used during the season," by which the optional feature of the contract is qualified.

Claimed controlling cases cited by defendant, where the quantity or amounts to be furnished is left uncertain and the contract held valid are distinguishable from this in wording and provisions. In most of them the obligations are mutual, to buy as well as sell, while here defendant was free, beyond the express purchase of 25,000 gross, to disregard the optional provision of the contract and buy elsewhere as it saw fit.

*Hickey* v. *O'Brien,* 123 Mich. 611 (49 L. R. A. 594, 81 Am. St. Rep. 227), cited by defendant, involved a contract by which one party agreed to furnish and the other to buy all the ice "necessary to carry on" the latter's business in a named city for five years at a stated price per ton, and the court denied the claim that it was void for want of mutuality, the necessities of the business furnishing the measure of the quantity to be taken. *E. G. Dailey Co.* v. *Clark Can Co.,* 128 Mich. 591, throws little light on the issue before us. It involved an agreement by which the Clark Can Company was to furnish at a stated price and the Dailey Company was to buy all tin cans the latter "may use" in its canning business for a stated period. The court held it a binding contract for the

time specified and submitted various issues of fact raised by the testimony to the jury.    One of the issues was whether the Dailey Company had used during the specified period cans not purchased from defendant. This court pronounced as "correct" the following charge upon that issue: "If you find he used other cans, then there is a misrepresentation, and it would prevent him from recovery."    A linguistic inquiry into the various permissible gradations of meaning of the word "used" in the abstract does not serve to settle its concrete meaning in this contract.    In the connection and sentence where found it relates to a commodity employed, put to a purpose or consumed in the brewing of beer and preparing it for market.    In that connection the natural and readily accepted sense of "used during the season" as applied to crowns or caps made by a cork and seal company and bought for corking beer bottles, is that they were to be employed, put to that purpose, consumed or used up during the time limit specified.    But accepting this as a requirement contract entitling defendant to a reasonable supply of the commodity in advance of its actual needs during 1917, because of its known custom to carry a reserve, it is shown that at the expiration of the season to which the use was limited it had on hand for future use a sufficient supply to carry it through the ensuing winter season.

The judgment will stand affirmed.

CLARK, C. J., and MCDONALD, BIRD, SHARPE, MOORE, FELLOWS, and WIEST, JJ., concurred.