# STATE OF MICHIGAN

# COURT OF APPEALS

MANUSHAQE PASHO, also known as
MANUSHAQ PASHO, a Disabled Person, by
ASIE PASHO, also known as ASHIE PASHO, and
by SEBAHAT PASHO, as Guardians,

Plaintiffs-Appellants,

v

DAVID LEE MCCOWAN and U.S. CARGO
EXPRESS, LLC,

Defendants-Appellees.

UNPUBLISHED
July 24, 2018

No. 338231
Monroe Circuit Court
LC No. 16-138616-NI

Before: CAMERON, P.J., and JANSEN and O'CONNELL, JJ.

PER CURIAM.

In this negligence action arising out of a fatal traffic accident, plaintiffs Asie Pasho and Sebahat Pasho, acting as guardians for their disabled daughter, Manushaqe Pasho (Pasho), appeal as of right the trial court's order granting defendants David Lee McCowan and U.S. Cargo Express, LLC (U.S. Cargo) summary disposition under MCR 2.116(C)(10). We affirm.

This case arises out of a fatal traffic accident on March 5, 2014, at the intersection of a "trunk line" highway, US-24 (Telegraph Road), and Sigler Road in Ash Township. The accident involved a loaded tractor-trailer driven by McCowan, and an SUV driven by the then-teenaged Pasho. The road conditions on the date of the accident were normal, with dry road surfaces and no weather conditions that would have called for slowed travel.

According to an investigating officer, the intersection is a two-way stop, with stops signs posted for both directions of travel on Sigler Road. In other words, drivers on Sigler Road were required to stop at the intersection and yield the right of way to motorists on Telegraph Road, the latter of whom had no traffic controls at that intersection.

On the date in question, McCowan was hauling property for U.S. Cargo. He was driving northbound on Telegraph Road, traveling in the far right lane of that four-lane highway at speeds which, at all pertinent times for purposes of this case, did not exceed 54 miles per hour. The posted speed limit was 55 miles per hour. As McCowan proceeded toward the intersection, he "caught a glimpse" of Pasho's vehicle, which was headed eastbound on Sigler Road toward the

-1-

stop sign at the intersection. But there was "shrubbery or something . . . that blocked the view," so McCowan was unable to see whether Pasho actually stopped.[1] Knowing that he had the right of way, McCowan assumed that Pasho would stop at the stop sign and wait until it was safe for her to enter the intersection before doing so. Accordingly, he continued driving north without slowing. An eyewitness recounted that Pasho did stop—initially—but then she proceeded out into the intersection, driving directly into McCowan's path. Either before or at impact, McCowan braked and veered to the right (he was fearful of hitting oncoming traffic if he veered to the left), but he was unable to stop in time. Indeed, plaintiffs' own proposed expert, Jonathan R. Crane, acknowledged that *after* braking, veering, and impacting Pasho's SUV, it took the semi-truck a full four seconds to come to a complete stop. Tragically, Pasho's teenaged passenger, Chelsea Klocek, died as a result of the injuries she sustained in the accident, and it is undisputed here that Pasho also suffered severe injuries.

Plaintiffs subsequently brought this action against defendants, alleging negligence on McCowan's part and asserting vicarious liability against U.S. Cargo. Following discovery, defendants moved for summary disposition under MCR 2.116(C)(10), arguing that there was no genuine issue of material fact that Pasho had suddenly darted out into the intersection, unlawfully impeding McCowan's right of way, and that until she did so, McCowan owed her no duty. Defendants further argued that plaintiffs had failed to present any evidence to create a genuine issue of material fact whether McCowan breached his duty of care, failing to present any evidence that McCowan's actions of slamming on his brakes and veering to the right were unreasonable under the emergent circumstances. After considering the matter, the trial court granted defendants summary disposition, relying principally on *Arnold v Krug*, 279 Mich 702; 273 NW 322 (1937). On appeal, plaintiffs argue that the trial court erred by so ruling. We disagree.

We review de novo a trial court's decision regarding a motion for summary disposition. *Heaton v Benton Constr Co*, 286 Mich App 528, 531; 780 NW2d 618 (2009).

> A motion under MCR 2.116(C)(10) tests the factual support of a plaintiff's claim. Summary disposition is appropriate under MCR 2.116(C)(10) if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. In reviewing a motion under MCR 2.116(C)(10), this Court considers the pleadings, admissions, affidavits, and other relevant documentary evidence of record in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists to warrant a trial. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ. [*Zaher v Miotke*, 300 Mich App 132, 139-140; 832 NW2d 266 (2013) (quotations marks and citations omitted).]

---

[1] Several witnesses, including police officers and an eyewitness who lives near the intersection, confirmed that there was poor visibility at the intersection due to nearby pine trees.

"Only the substantively admissible evidence actually proffered may be considered." *1300 LaFayette East Coop, Inc v Savoy*, 284 Mich App 522, 525; 773 NW2d 57 (2009) (quotation marks and citation omitted). "Circumstantial evidence can be sufficient to establish a genuine issue of material fact, but mere conjecture or speculation is insufficient." *McNeill-Marks v Midmichigan Med Ctr-Gratiot*, 316 Mich App 1, 16; 891 NW2d 528 (2016). "This Court is liberal in finding genuine issues of material fact." *Jimkoski v Shupe*, 282 Mich App 1, 5; 763 NW2d 1 (2008).

"It is usually held that in order to state a negligence claim on which relief may be granted, plaintiffs must prove (1) that defendant owed them a duty of care, (2) that defendant breached that duty, (3) that plaintiffs were injured, and (4) that defendant's breach caused plaintiffs' injuries." *Henry v Dow Chem Co*, 473 Mich 63, 71-72; 701 NW2d 684 (2005). That fourth element, proximate causation, actually incorporates two distinct legal concepts: (1) factual (or "but for") causation (i.e., "that the harmful result would not have come about but for the defendant's negligent conduct"), and (2) "legal" causation (i.e., an analysis that "normally involves examining the foreseeability of consequences, and whether a defendant should be held legally responsible for such consequences"). *Haliw v City of Sterling Hts*, 464 Mich 297, 310; 627 NW2d 581 (2001).

"The threshold issue of the duty of care in negligence actions must be decided by the trial court as a matter of law. In other words, the court determines the circumstances that must exist in order for a defendant's duty to arise." *Riddle v McLouth Steel Prod Corp*, 440 Mich 85, 95; 485 NW2d 676 (1992).

> Duty may be established specifically by mandate of statute, or it may arise generally by operation of law under application of the basic rule of the common law, which imposes on every person engaged in the prosecution of any undertaking an obligation to use due care, or to so govern his actions as not to unreasonably endanger the person or property of others. [*Id.* (quotation marks and citation omitted).]

"Once a defendant's legal duty is established, the reasonableness of the defendant's conduct under that standard is generally a question for the jury." *Id*. at 96. In other words, ordinarily "[t]he jury must decide whether the defendant breached the legal duty owed to the plaintiff, that the defendant's breach was the proximate cause of the plaintiff's injuries, and thus, that the defendant is negligent." *Id*. "What constitutes reasonable care under the circumstances must be determined from the facts of the case." *Id*. at 97. However, "[i]f reasonable minds could not differ regarding the proximate cause of a plaintiff's injury, courts should decide the issue as a matter of law." *Black v Shafer*, 499 Mich 950, 951 (2016), citing *Mich Dep't of Transp v Christensen*, 229 Mich App 417, 424; 581 NW2d 807 (1998).

In this case, the trial court relied on *Arnold*, a case with remarkably similar facts. In *Arnold*, 17-year-old Alice Arnold was riding as a passenger in a car driven by Leslie Doerr. *Arnold*, 279 Mich at 705. The two were traveling on a dirt road that intersected M-81, which is a paved trunk line highway. *Id*. at 704-705. Because of a nearby embankment, the intersection of the dirt road and M-81 had poor visibility in certain directions, making it "so travelers approaching from the south and the west cannot see each other until within 30 or 35 feet of the

center of the intersection." *Id*. at 704. The defendant truck driver "was familiar with the intersection." *Id*. at 705. As he approached it, he drove on the right side of the road, "with his truck under control," at 45 miles per hour. *Id*. at 705, 708. He did not slow down as he approached the intersection. *Id*. at 705. As the vehicles neared one another, Doerr did not stop or survey traffic, instead proceeding out into the intersection at 15 miles per hour. *Id*. The truck driver was unable to "see the Doerr car until it darted out upon the pavement," at which point the truck driver "applied his brakes when 20 to 25 feet from the Doerr car, and swung to the left to avoid it, but struck the car on the left side between the wheels." *Id*. Arnold subsequently died from her injuries, and her estate sued. *Id*. Our Supreme Court held that, "as a matter of fact and law, [the truck driver] was not guilty of actionable negligence." *Id*. at 709. In pertinent part, the Court reasoned as follows:

Defendant, being on a trunk line highway, had the right of way.

* * *

The right of way accorded to a driver upon a trunk line highway is something more than the privilege of going through the intersection in advance of a car which reaches it at the same time. Drivers approaching the trunk line are required to stop before entering the intersection whether any one is at or near the crossing or in sight on the trunk highway. It is an improved road—usually hard surfaced. Its purpose is to afford rapid transit. The driver is entitled to assume that those approaching it will obey the law and stop. He is not obliged to have his car under such control at each intersecting road that he may stop at once and avoid collision with persons who may illegally come into his path.

On the other hand, he must keep such lookout ahead and to the sides and down intersecting highways as a reasonably prudent person would do in order to discover possible danger and must act carefully upon the existing conditions.

A driver cannot be convicted of negligence on a general charge that he did not exercise the care a prudent person would have used under the circumstances. It is necessary to charge and prove the specific act he did or did not do. [The truck driver] was driving on the right side of the road at a very reasonable rate of speed and with his truck under control. The only claim of fault which could be made against him . . . is that he failed to reduce his speed as he neared the intersection. But to what rate should he have reduced the speed? It is evident that, to have avoided the collision, he would have had to so slacken his speed that he could have stopped well within 30 feet. To impose such a duty on drivers upon trunk line highways would seriously impair their purpose, be foreign to the general conception of careful drivers of their rights and duties upon them, in large measure destroy the preferential right of way, and offer inducement to drivers approaching on intersection roads to violate their legal duties. It is not the rule as a matter of law.

Nor as a matter of fact was such duty to slacken speed imposed on [the truck driver]. He was obliged to anticipate such possible danger in the

-4-

intersection and do such acts to avoid it as a reasonably prudent person would have anticipated and done, if such person had the knowledge of the situation which [the truck driver] possessed, and had the right to assume that one about to enter the trunk highway at the intersection would perform his legal duty to stop and look for traffic.

It is hardly reasonable to say that a prudent person, driving on a through highway and familiar with the conditions, would have anticipated such progressively remote possibilities as that—

(1) A car might come from the south on the rough and infrequently traveled road, where travel is necessarily slow and the duty to stop at the through highway thereby emphasized;

(2) Its driver would not look for approaching cars on the through highway;

(3) He would fail to observe a very common rule of law, and of even less than ordinary care, by neglecting to stop before entering the intersection; and

(4) To cap the climax of a total want of common prudence—he would make a short turn to the left into a part of the intersection where he had no right to be.

Reduced to its essentials, [the truck driver] was driving at a reasonable rate of speed and without duty or reason to anticipate the possibility of such extraordinary conditions as Doerr brought about, the danger did not appear until it was too late for [the truck driver] to avoid an accident, and the proximate cause of the collision was the negligence of Doerr and not the conduct of [the truck driver]. [*Id*. at 707-709.[2]]

In a later decision, *McGuire v Rabaut*, 354 Mich 230, 236; 92 NW2d 299 (1958), our Supreme Court reiterated that a driver proceeding on a trunk line highway has no "duty of care with respect to the subordinate driver" on the intersecting road until "that point when . . . continuing

---

[2] We are cognizant that *Arnold* was decided before *Placek v City of Sterling Hts*, 405 Mich 638; 275 NW2d 511 (1979), in which our Supreme Court rejected the contributory negligence rule and replaced it with a comparative negligence approach. *Arnold* was also decided before *Petrove v Grand Trunk W R Co*, 437 Mich 31; 464 NW2d 711 (1991), in which our Supreme Court repudiated the "last clear chance" doctrine. However, because *Arnold* did not explicitly rely on either of those now defunct legal doctrines, we conclude that *Arnold* remains authoritative under the doctrine of stare decisis, never having been overruled by our Supreme Court. See *Paige v City of Sterling Hts*, 476 Mich 495, 524; 720 NW2d 219 (2006) (noting that "only" our Supreme "Court has the authority to overrule one of its prior decisions," and that until it "does so, all lower courts . . . are bound by that prior decision and must follow it even if they believe that it was wrongly decided or has become obsolete").

observations . . . reveal, or should reveal to the reasonably prudent [person], an impending danger. It is at this time that [a] duty of care with respect to the subordinate driver arises, and . . . post-observation negligence, or lack thereof, is measured by . . . actions after this point."

As an initial consideration, as recently emphasized in *Ray v Swager*, 501 Mich 52, 97-98; 903 NW2d 366 (2017) (WILDER, J., dissenting), the phrase " 'legal cause' is a misnomer insomuch as it has nothing at all to do with *causation*; instead, it involves examining the foreseeability of consequences, and whether a defendant should be held legally responsible for such consequences." (Quotation marks and citation omitted.) See also *id*. at 88 n 5, citing 1 Restatement Torts 3d: Liability for Physical & Emotional Harm, Special Note on Proximate Cause, ch 6, pp 492-493 (noting that the use of the word "cause" "contributes to the misleading impression that limitations on liability somehow are about factual cause"). As a frequently cited treatise on the subject puts it, "[s]cope of liability, formerly termed proximate cause, is not about causation at all but about the significance of the defendant's conduct or the appropriate scope of liability in light of moral and policy judgments about the very particular facts of the case." 1 Dobbs, Hayden & Bublick, Torts, § 185, p 622.[3]

As the interplay between the majority and dissent in *Ray* suggests, legal causation is a decidedly complex concept, which "encompasses a number of distinct problems including the limits of liability for foreseeable consequences." *Moning v Alfono*, 400 Mich 425, 439; 254 NW2d 759 (1977). The converse problem—"[t]he problem of liability for *un*foreseeable consequences"—is also part of the legal causation calculus. *Id*. at 440 n 13 (quotation marks and citation omitted; emphasis added). At root, "[a] proper legal causation inquiry considers whether an actor *should* be held legally responsible for his or her conduct," *Ray*, 501 Mich at 65 (emphasis added), "seek[ing] to determine the appropriate scope of a *negligent* defendant's liability," *id*. at 65 n 24. Part of that inquiry—i.e., who should be held liable—consists of examining the "policy judgments" that underlie this state's common-law negligence jurisprudence, as enunciated in caselaw such as *Arnold*. See Dobbs, § 185, p 622; see also *Moning*, 400 Mich at 436 ("The law of negligence was created by common law judges and, therefore, it is unavoidably the Court's responsibility to continue to develop or limit the development of that body of law absent legislative directive.").

In light of the policy considerations discussed in *Arnold*, it was appropriate for the trial court to conclude, as a matter of law, that McCowan's actions did not fall within the proper scope of liability. In one sense, it *was* reasonably foreseeable that McCowan's act of driving down Telegraph Road at a lawful rate of speed might result in injuries to someone at some point. As has been recognized in the context of negligence actions in the realm of premises liability, "[b]ecause criminal activity is irrational and unpredictable, it is . . . invariably foreseeable *everywhere*." *MacDonald v PKT, Inc*, 464 Mich 322, 335; 628 NW2d 33 (2001) (emphasis added). The same is true of reckless driving, particularly when teenage drivers are involved. It

---

[3] Between the majority and dissenting opinions in *Ray*, the Dobbs treatise was cited more than a dozen times. Accordingly, it seems that our Supreme Court has taken such a favorable view of Dobbs that it may be regarded as persuasive secondary authority.

is certainly "foreseeable"—in an abstract sense—that some motorists will drive in a dangerous or reckless manner.

Such *abstract* foreseeability does not, however, justify holding motorists on trunk line highways "effectively vicariously liable for the criminal acts of third parties." See *id*. Although it is reasonably foreseeable that some driver at some intersection with a high-speed, trunk line highway will, at some point, suddenly drive into the path of an oncoming semi-truck that has the right of way, at any given intersection that outcome is not reasonably foreseeable. As *Arnold* recognized, it is simply not reasonable to expect drivers on trunk line highways to constantly anticipate such behavior from other motorists. See *Arnold*, 279 Mich at 707-709. And from a policy standpoint, doing so would fundamentally undermine the purpose of the trunk line system (i.e., rapid transit), would "be foreign to the general conception of careful drivers of their rights and duties upon" roadways, would "in large measure destroy the preferential right of way," and would "offer inducement to drivers approaching on intersection roads to violate their legal duties." *Id*. at 707-708.

In this case, there is no genuine factual dispute regarding the essential facts. Pasho suddenly impeded McCowan's lawful right of way. Her conduct in doing so was unlawful, and as evidenced by her own severe injuries and her passenger's death, it was so unexpected as to be inherently unforeseeable. Under the doctrine of legal causation, this state's common-law negligence jurisprudence, as announced in *Arnold*, will not attribute liability for Pasho's injuries to McCowan, who was simply traveling on a trunk line highway lawfully and in control of his vehicle. See *id*. at 707-709. Summary disposition was appropriately granted.

Affirmed.

/s/ Thomas C. Cameron
/s/ Kathleen Jansen
/s/ Peter D. O'Connell